# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RONNIE SMITH**, | Case No. 6:16-cv-1771-SI |
| Plaintiff, | **OPINION AND ORDER ON PRETRIAL MATTERS** |
| v. | |
| **CITY OF THE DALLES** and **KOJI NAGAMATSU**, | |
| Defendants. | |

James E. Geringer, KLARQUIST SPARKMAN LLP, One World Trade Center, 121 SW Salmon Street, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiff.

Gerald L. Warren, LAW OFFICE OF GERALD L. WARREN AND ASSOCIATES, 901 Capitol Street NE, Salem, OR 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

In this Opinion and Order on Pretrial Matters, the Court resolves certain issues *sua sponte* as a matter of law after reviewing the parties' pretrial submissions and giving the parties an opportunity to be heard. As discussed below, the Court finds, based on undisputed facts, that Defendant Koji Nagamatsu, a police officer, unconstitutionally placed Plaintiff in handcuffs and searched Plaintiff's pocket without probable cause and without specific and articulable facts showing that Plaintiff posed an immediate threat of serious physical injury to Officer Nagamatsu or others or demonstrated an intention to evade arrest. The Court bases this finding on

Defendants' witness statements (ECF 128), the Declaration of Koji Nagamatsu (ECF 53), the Supplemental Declaration of Koji Nagamatsu (ECF 62), the trial testimony of Koji Nagamatsu from Plaintiff's criminal trial (ECF 129-1 at 24-31), and the Declaration of Michael Waine (ECF 54). It is undisputed that Officer Nagamatsu placed Plaintiff in handcuffs and reached into Plaintiff's pocket *before* receiving important information from a fellow officer, Michael Waine. The Court also rules on the parties' motions *in limine*, pretrial objections to evidence, and what the Court construes as Defendants' motions for reconsideration raised in Defendants' trial brief. The Court previously provided the parties with notice of these anticipated rulings (*see* ECF 153, ECF 156, and ECF 161) and gave the parties an opportunity to address these issues at the pretrial conference held on June 1, 2021.

## STANDARDS

Rule 16 of the Federal Rules of Civil Procedure provides that at a pretrial conference, a court may "consider and take appropriate action" on matters, including "formulating and simplifying the issues, and eliminating frivolous claims or defenses." Fed. R. Civ. P. 16(c)(2)(A). As explained by the advisory committee, the reference "to 'formulation' is intended to clarify and confirm the court's power to identify the litigable issues. It has been added in the hope of promoting efficiency and conserving judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone." Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. Further, "[t]he notion is emphasized by expressly authorizing the elimination of frivolous claims or defenses at a pretrial conference. There is no reason to require that this await a formal motion for summary judgment. Nor is there any reason for the court to wait for the parties to initiate the process called for in Rule 16(c)(1)." *Id.* Rule 56 of the Federal Rules of Civil Procedure similarly provides that a court may *sua sponte* grant summary judgment or partial summary judgment, without a motion by the parties. *See* Fed. R. Civ. P. 56(f)

(providing that a court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute").

The Ninth Circuit has confirmed a district court's authority to *sua sponte* raise and summarily dispose of issues at a pretrial conference. *Portsmouth Square Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985). The Ninth Circuit concluded that "[i]f the pretrial conference discloses that no material facts are in dispute and that the undisputed facts entitle one of the parties to judgment as a matter of law, a summary disposition of the case conserves scarce judicial resources. The court need not await a formal motion, or proceed to trial, under those circumstances." *Id.* The Ninth Circuit emphasized that the party against whom the issues are resolved must have had "a full and fair opportunity to develop and present facts and legal arguments in support of its position." *Id.*

## BACKGROUND

On May 28, 2015, the manager at Grinders Coffee, a coffee shop in the City of The Dalles, Oregon (the City), called 911 emergency services (911). The manager stated that a man had just attempted to steal a tip jar containing cash. The manager explained that the coffee shop "got our money back" but added that "apparently" the man still had some money, or at least she "believe[d]" he might have money in his pocket but that she "[didn't] know if he currently has any on him." ECF 86-1 at 1-2. The manager described the suspect as an African American man wearing a white shirt with the letters "LA" on the front and brown shorts and said that the man was carrying a black backpack as he walked westbound on Third Street toward the Wells Fargo Bank.

Defendant Nagamatsu, a police officer working for the City, was nearby. The 911 dispatcher dispatched Officer Nagamatsu to investigate. Officer Nagamatsu saw Plaintiff Ronnie Smith (also known as Ronnie Medinger), who is an African American male, walking in front of

the Wells Fargo Bank wearing a white shirt with the letters "LA" on the front and carrying a

black duffle bag. Officer Nagamatsu got out of his patrol car and asked Plaintiff to drop the bag

and put his hands behind his back. Plaintiff complied with both requests. Officer Nagamatsu also

asked Plaintiff to identify himself but Plaintiff refused.[1] Officer Nagamatsu told Plaintiff that the

Officer was detaining Plaintiff because Plaintiff fit the description of the suspect in the reported

theft of a tip jar from the coffee shop. Plaintiff denied taking any money from the tip jar. Officer

Nagamatsu placed Plaintiff in handcuffs.[2] After handcuffing Plaintiff, Officer Nagamatsu saw a

---

[1] The timing of when Officer Nagamatsu first asked Plaintiff for his name is not clear from the documents submitted by Defendants. It is clear that Officer Nagamatsu asked Plaintiff his name later in the encounter, when Plaintiff was being recorded. Officer Nagamatsu's police report includes a general paragraph in the middle of his chronological narration that discusses Plaintiff's general uncooperativeness, including his failure to give his name, and that Officer Nagamatsu did not find a wallet or identification when searching Plaintiff. This paragraph recites facts from various points in time throughout the Officer's encounter with Plaintiff. The police report specifically describes Officer Nagamatsu's initial encounter with Plaintiff as only involving Officer Nagamatsu's demands that Plaintiff drop his duffle bag and put his hands behind his back, without mention of the Officer asking Plaintiff to identify himself. Officer Nagamatsu's Second Declaration states that, regarding the pat down search, "upon my contact" Officer Nagamatsu asked Plaintiff's name, without describing when during that contact Officer Nagamatsu asked Palintiff's name. The Court recites the facts in the light most favorable to Defendants. More importantly, this fact is not material to the Court's findings and conclusions in this Opinion and Order.

[2] Defendants' witness statement states that Officer Nagamatsu will testify that he placed Plaintiff in handcuffs because he matched the description of the suspect and because Plaintiff denied taking any money. ECF 128 at 2. This proposed testimony would indicate that Plaintiff denied taking any money *before* he was placed handcuffs. This is inconsistent, however, with Officer Nagamatsu's contemporaneous police report (ECF 53-1), which states that Plaintiff asked what was going on *as Officer Nagamatsu was placing handcuffs on Plaintiff*, to which Officer Nagamatsu responded by explaining why Plaintiff was being detained, and only then did Plaintiff "bec[o]me very standoffish," state that he had no idea what Officer Nagamatsu was talking about, and deny taking money. It also appears inconsistent with Officer Nagamatsu's sworn declarations (ECF 53, 62), which recite the facts of the encounter in chronological order, and state that Plaintiff denied taking any money only after Officer Nagamatsu recites the facts about handcuffing Plaintiff. As previously noted, however, the Court recites the facts in the light most favorable to Defendants. The Court thus presumes for purposes of this Opinion and Order that Plaintiff generally denied taking money before he was handcuffed. By doing so, the Court makes no finding regarding what statements Plaintiff did or did not make while in handcuffs. Additionally, Officer Nagamatsu's purported reason for placing the handcuffs on Plaintiff is not

"bulge" in Plaintiff's pocket and performed a pat down (or frisk) to determine whether Plaintiff

was carrying a weapon. Officer Nagamatsu reached into Plaintiff's pocket and removed a wad of

crumbled bills, consisting of one $10 bill and six $1 bills. Officer Nagamatsu retained the money

as possible evidence.

After Officer Nagamatsu placed Plaintiff in handcuffs and searched Plaintiff's pocket,

another police officer, Officer Michael Waine, interviewed witnesses at the coffee shop, which

was located about one block from the Wells Fargo Bank. After Officer Nagamatsu had

handcuffed Plaintiff and retrieved the money from Plaintiff's pocket, Officer Waine radioed to

Officer Nagamatsu. Officer Nagamatsu told Officer Waine that he had found one $10 bill and

several $1 bills on Plaintiff. Officer Waine then told Officer Nagamatsu that witnesses

remembered a $10 bill being in the tip jar before Plaintiff attempted to take the jar but not being

in the jar afterward. Officer Waine also confirmed from the coffee shop that one or more

witnesses, then looking down the street toward Officer Nagamatsu and Plaintiff, positively

identified Plaintiff as the suspect, even from that distance. According to Officer Nagamatsu, he

then read Plaintiff his *Miranda* rights and began recording the encounter. When he did not obtain

any useful statements from Plaintiff, Officer Nagamatsu turned off his recording device and

placed Plaintiff in the back of Officer Nagamatsu's marked patrol car. Officer Nagamatsu

reported that Plaintiff made additional statements while in the back of the patrol car.

Officer Nagamatsu transported Plaintiff to the Northern Oregon Regional Correctional

Facility for booking. Plaintiff was arraigned on the misdemeanor offense of Theft III. Two years

later, in June 2017, Plaintiff went to trial in Municipal Court, where a jury found him guilty of

---

material to the Court's probable cause finding, which is based on Officer Nagamatsu's failure to
conduct an independent investigation, or the Court's finding of an unlawful search, which is
based on Officer Nagamatsu's conduct relating to the search of Plaintiff's pocket.

Theft III. Plaintiff appealed, which entitled him to a trial *de novo* in Wasco County Circuit Court. In February 2018, the City prosecutor dismissed the charge.

During Plaintiff's trial in Municipal Court, Officer Nagamatsu testified about certain statements made by Plaintiff. In the pending case, the parties dispute when Officer Nagamatsu began recording Plaintiff's statements. Officer Nagamatsu asserts in his police report that he turned on his recording device *after* giving Plaintiff his *Miranda* rights. Plaintiff, however, contends that Officer Nagamatsu turned on the recording device and began to question Plaintiff before reading Plaintiff his *Miranda* rights. At Plaintiff's trial in Municipal Court, Officer Nagamatsu testified that he uses a digital recorder that he carries with him to record testimony. In the pending case, Defendants submitted a transcript of the audio recording. The transcript shows Officer Nagamatsu questioning Plaintiff. In that transcript, there is no mention of *Miranda* warnings having been given and no recording of Officer Nagamatsu giving Plaintiff any *Miranda* warning.

Plaintiff contends that Officer Nagamatsu also questioned Plaintiff after placing him in handcuffs but before Officer Nagamatsu gave Plaintiff any *Miranda* warnings. The parties, however, dispute the degree of questioning and what specific statements Plaintiff made before he received his *Miranda* warnings. Plaintiff alleges that statements he made *before* being given his *Miranda* rights were later used against him at the Municipal Court trial, in violation of Plaintiff's rights under the Fifth Amendment. This is the basis of Plaintiff's Fifth Amendment claim under § 1983. *See Tekoh v. County of Los Angeles*, 985 F.3d 713 (9th Cir. 2021).

## *SUA SPONTE* FINDINGS BY THE COURT AFTER NOTICE

Plaintiff's lawsuit alleges violations of Plaintiff's rights under the Fourth and Fifth Amendments to the United States Constitution,[3] made actionable under 42 U.S.C. §1983, and also violations of Oregon law. The primary question under the Fourth Amendment and related state law in this case is whether Officer Nagamatsu's act of placing Plaintiff in handcuffs was proper. As discussed below, if Officer Nagamatsu had a reasonable belief at the time that Plaintiff was armed and dangerous or about to flee, handcuffing Plaintiff at that stage of the investigation might be constitutional and lawful. If, however, the officer did not hold such a belief or if such a belief, if held, was objectively unreasonable, then the act of handcuffing would convert the investigatory stop into an arrest. For an arrest under these circumstances to be constitutional and lawful, the arresting officer must have probable cause to believe that a crime had been committed and that the person being arrested had committed that crime. After considering all the evidence submitted by the parties before trial and after hearing argument by counsel, the Court summarily disposes of the following matters, concluding that no reasonable juror could find otherwise or that the issue presents a question of law for the Court to decide.

## A.  No Probable Cause to Arrest

### 1.  Federal Law

When the underlying facts are undisputed, probable cause is an issue of law for the Court and not one of fact for the jury. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003). "Probable cause to arrest exists when

---

[3] For simplicity, the Court refers to the Fourth and Fifth Amendments, and not the Fourteenth, in the context of Plaintiff's § 1983 claims. The Supreme Court has incorporated both the Fourth and Fifth Amendments and applied applies them to the states through the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436 (1966); *Mapp v. Ohio*, 367 U.S. 643 (1961).

officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe an offense has been or is being committed by the person being arrested." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008). "[U]nder this standard to establish probable cause, mere suspicion, common rumor, or even strong reason to suspect are not enough." *Id.* The parties do not dispute the underlying material facts about when Officer Nagamatsu placed Plaintiff in handcuffs. The Court previously found, in resolving Defendants' second motion for summary judgment, that no probable cause existed to arrest Plaintiff at the time Officer Nagamatsu placed Plaintiff in handcuffs. *See* ECF 101 at 13, 19, 26.[4]

Defendants argue both in their trial brief and in their objections to the Court's tentative opinion that Officer Nagamatsu had probable cause to arrest Plaintiff at the time he was handcuffed based solely on the information from the 911 caller. The Ninth Circuit, however, has repeatedly held that "[in] establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)). A review of several Ninth Circuit cases under the *Arpin* and *Fuller* rule shows why no probable cause existed in this case at the time Plaintiff was placed in handcuffs.

In *Fuller*, a jewelry store employee identified the suspects and described to police how the suspects were the only people to handle the missing ring that was presumed stolen.

---

[4] In their first motion for summary judgement, Defendants stated that that Officer Nagamatsu only "arrested" Plaintiff *after* Officer Nagumatsu learned the results of Officer Waine's interviews with the eyewitnesses, which was *after* Officer Nagamatsu placed Plaintiff in handcuffs. *See* Defs.' Mot. for Sum. J. (ECF 52) at 7 ("Here, Defendant Nagamatsu *arrested* plaintiff *following* communication from a fellow officer that plaintiff had been positively identified by eyewitnesses as the thief.") (emphasis added).

*Fuller*, 950 F.2d at 1443. The Ninth Circuit disagreed with the appellees that "merely because citizen witnesses are presumptively reliable, the officers in the situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses." *Id.* at 1444. Instead, the Ninth Circuit determined that the police officers "had a duty to conduct an investigation into the basis of the witness' report" despite a detailed witness report. The Ninth Circuit concluded, however, that the officers "did *not* rely solely on the uncorroborated testimony of a citizen witness before arresting the Fullers" because the officers "investigated further by questioning: (1) a second store employee, who confirmed that the Fullers were the last people to be seen with the ring; (2) the witness who allegedly saw Annise [Fuller] attempting to vomit in the rest room; and (3) the Fullers and their companion." *Id.* (emphasis in original) Thus, "based on all of the information [the officers] obtained," the Ninth Circuit concluded that the officers "could have reasonably believed that there was probable cause to arrest the Fullers." *Id.* at 1444-45.

*Arpin* involved a motion to dismiss. The Ninth Circuit concluded that the plaintiff stated a claim against the officers because the plaintiff's allegations supported that the officers arrested the plaintiff based on the witness's "unexamined charge." *Arpin*, 261 F.3d at 925. The Ninth Circuit explained that if the officers "did not independently investigate Ruiz's claim of battery, they did not have probable cause to arrest Arpin." *Id.*

In *United States v. Struckman*, a neighbor "called 911 and reported that she saw a white male wearing a black leather or vinyl jacket throw a red backpack over her neighbors' fence and then climb over the fence into their backyard." 603 F.3d 731, 736 (9th Cir. 2010). The neighbor also reported that the homeowners' were not currently at home. *Id.* Officers arrived on the scene and found a person matching the description—a white male with a black leather jacket—walking

inside the fenced back yard, along with a red backpack by the deck. *Id.* The officers testified that

the suspect appeared "surprised" when he saw the officers, although he did not try to run and he

did not have any apparent weapons or burglary tools on his person. *Id.* The officers drew their

firearms, ordered the suspect to his knees, and handcuffed him. *Id.* While handcuffed, the suspect

"began cursing sporadically" and stated that he lived in the house with his mother. *Id.* at 737.

The officers ignored him and conducted a pat down search. *Id.*

The government asserted that the officers had probable cause to arrest Struckman without

a warrant, and the Ninth Circuit concluded that assertion was "plainly incorrect." *Id.* at 739. The

government argued that the officers had probable cause to believe that Struckman had committed

or was committing criminal trespass, attempted burglary, or burglary, based on the 911 call, the

officers' sighting of Struckman, and Struckman's reaction to seeing the officers. *Id.* at 740. The

Ninth Circuit described that "the officers came to the house because of information obtained

from the 911 call—namely, that a white male wearing a black jacket had thrown a red backpack

over a fence and climbed into the backyard when the homeowners were reportedly not home.

They then visually confirmed that a person who fit the description was in the backyard and that

there was a red backpack lying against a deck inside the yard." *Id.* at 741. The Ninth Circuit

explained, however, that because "innocent reasons" or other circumstances may exist, "[t]o

avoid such errors as occurred here, in seeking to establish probable cause, officers may not solely

rely on the claim of a citizen witness, but must independently investigate the basis of the

witness' knowledge or interview other witnesses." *Id.* at 742 (simplified). The court further

explained that "there was, in fact, much else the officers could have done to investigate the

reported activity," including asking the 911 caller questions and asking Struckman questions

instead of immediately ordering him to get on his knees and detaining him. *Id.* (simplified).

In *Hopkins v. Bonvicino*, Mr. Hopkins got in a minor traffic accident with Ms. Talib. 573 F.3d 752, 760 (9th Cir. 2009). Ms. Talib followed Mr. Hopkins home without his knowledge, confronted him in front of his house, and then he "quickly" went into his house. Ms. Talib called the police and reported that she had been involved in a hit-and-run accident, had followed the driver home, and believed the driver was intoxicated. *Id.* at 760-61. She repeated her accusation when the officers arrived at Mr. Hopkins' house. *Id.* at 761. Mr. Hopkins did not answer the door when the police knocked. The police broke into the house, entered with guns drawn, found Mr. Hopkins on the floor of his bedroom (where he had fallen from his bed upon hearing the police break in), demanded he get up with his hands up, and they handcuffed him. *Id.* at 762.

The Ninth Circuit concluded that, "[i]n violation of the rule set forth in *Arpin* and *Fuller*, the officers here entered Hopkins' home based *solely* on the information they obtained from Talib—namely, that she had been involved in an extremely minor car accident with Hopkins, that she smelled alcohol on his breath, and that he appeared intoxicated." *Id.* at 767 (emphasis in original). The Ninth Circuit explained why this was insufficient:

> The officers did not inspect Hopkins' car to see if the hood was still warm, which would have corroborated Talib's statement that the car had recently been driven, nor did they inspect the vehicle for any evidence of reckless driving or of alcohol consumption, such as open containers or an alcoholic odor. They did not ask Talib any questions in order to gain information beyond her cursory and conclusory statements, such as whether she observed Hopkins driving erratically or at an abnormal speed. In short, the officers obtained no information whatsoever beyond Talib's brief statement. Under *Arpin* and *Fuller*, these statements from a witness, without further investigation by the police, are insufficient to support probable cause.

*Id.* (citation omitted).

Finally, in. *John v. City of El Monte*, the Ninth Circuit concluded that probable cause did exist because the officer conducted the requisite independent investigation. 515 F.3d 936, 940-41

(9th Cir. 2008). The officer, who had specialized training, "did not just accept Ashley's allegations of John's misconduct against her" but instead "properly drew upon his experience and his special training in dealing with sexual abuse of children and advanced interviewing in evaluating her story." *Id.* at 940. The officer "tested Ashley's veracity and reliability in various ways which, in his experienced judgment, indicated to him that she was telling the truth." *Id.* The Ninth Circuit added that finding probable cause was not inconsistent with *Arpin* because "Youngquist probed Ashley's allegations thoroughly prior to arresting John and did not base the arrest solely on an 'unexamined charge.'" *Id.* at 941.

Here, Officer Nagamatsu had *only* the uncorroborated testimony—relayed through 911,—of one citizen witness at the time he placed handcuffs on Plaintiff. It was an "unexamined charge." *Arpin*, 261 F.3d at 925. Neither Officer Nagamatsu nor any other officer had yet interviewed the complaining witness, let alone "probed [the] allegations thoroughly" or used specialized training to test the accuracy, veracity, and reliability of that witness's statement, thereby providing the requisite independent investigation, before placing Plaintiff in handcuffs. *See, e.g.*, *John*, 515 F.3d at 941. Nor had Officer Nagamatsu or any other officer interviewed any witnesses to confirm whether a crime had been committed or otherwise corroborate the 911 caller's information.

Further, neither Officer Nagamatsu nor any other officer had questioned Plaintiff, other than obtaining his general denial of taking money, to learn any possible innocent explanation of what the witness reported, before placing Plaintiff in handcuffs. *See, e.g.*, *Struckman*, 603 F.3d at 741 (noting that "innocent reasons could have explained what [the witness] did see"); *Fuller*, 950 F.2d at 1444 (finding dispositive the fact that the officer conducted additional investigation by interviewing other witnesses and the suspects). For example, Plaintiff could have accidentally

picked up the tip jar and then put it down. Assuming that Officer Nagamatsu told Plaintiff he matched the description of someone who allegedly took money from the tip jar and Plaintiff denied taking money from the tip jar before Officer Nagamatsu handcuffed Plaintiff, that is not an independent *investigation* into what happened. An officer telling someone they are accused of committing a crime and the suspect denying committing the crime is not, by itself, a reasonable investigation, or a basis for finding probable cause.[5]

Defendants argue that Officer Nagamatsu conducted an "independent investigation" by observing that Plaintiff matched the description of the 911 caller. That, however, is not an investigation *into the basis of the witness's knowledge. See, e.g.*, *Struckman*, 603 F.3d at 741-42 (finding that the officer's sighting of the suspect who matched the 911 caller's description was insufficient and further investigation was necessary); *Hopkins*, 573 F.3d at 767 (describing the various investigatory steps the officers could have taken beyond simply relying on the witness's report); *accord Arpin*, 261 F.3d at 925 (noting that an independent investigation into the basis of the witness's knowledge or the interviewing of other witnesses is required); *Fuller*, 950 F.2d at 1444 (finding as dispositive the fact that the officers conducted additional interviews). Because Officer Nagamatsu did not conduct the independent investigation required by the Ninth Circuit before handcuffing Plaintiff, probable cause did not exist at the time Officer Nagamatsu placed Plaintiff in handcuffs.[6]

---

[5] Defendants asked at the pretrial conference what Officer Nagamatsu could have done if he was the only officer on duty. He could have first stopped at Grinder's Coffee to briefly interview other witnesses to corroborate the 911 caller's report. He could have interviewed the 911 caller to obtain the basis of her knowledge. He could have stopped Plaintiff for a *Terry* stop without immediately handcuffing him, particularly because Plaintiff was cooperating with his demands and not fleeing, and interviewed Plaintiff.

[6] The Court notes that Officer Nagamatsu did not turn on his digital recorder until after Officer Waine conducted the required independent investigation, interviewing the eyewitnesses, obtaining the basis of the 911 caller's knowledge, confirming that a theft or attempted theft had

## 2. State Law

Similarly, under Oregon law, probable cause is an issue of law for the Court when the facts are undisputed. *Hylton v. Phillips*, 270 Or. 766, 771 (1974) ("This court has consistently held that if the facts are undisputed the existence of probable cause is one of law for the court.). Under Oregon law, "an officer has probable cause to make an arrest if: (1) the officer subjectively believes that a crime has been committed; and (2) the officer's subjective belief is objectively reasonable under the circumstances." *Miller v. Columbia Cty*, 282 Or. App. 348, 357 (2016). In the pending case, the Court previously denied Defendants' motion for summary judgment on this issue because it did not appear (nor had Defendants asserted) that Officer Nagamatsu had the subjective belief that Plaintiff committed a crime until *after* Officer Waine completed his investigation, which reported that money had been taken from the tip jar and confirmed Plaintiff's identification as the suspect in that taking. At that point, and only at that point, could Officer Nagamatsu properly arrest Plaintiff.

Defendants now argue that Officer Nagamatsu had the subjective belief that Plaintiff committed a crime at the time Officer Nagamatsu placed handcuffs on Plaintiff, even though Officer Nagamatsu stated that, subjectively, he did not "arrest" Plaintiff until later, *see* ECF 52 at 7, and the Officer did not turn on his digital recorder until later, which he testified he does when he believes a subject was involved with a crime, *see* ECF 129-1 at 31. Officer Nagamatsu's police report, testimony, and consistent position throughout this litigation has been that he

---

occurred, and confirming that Plaintiff was the suspect. Officer Nagamatsu did not turn on his recorder when he approached Plaintiff or handcuffed Plaintiff. Officer Nagamatsu testified at Plaintiff's trial in Municipal Court that he would not turn on his recorder when he encounters a person "[u]nless [he] felt that they were involved with a crime or about to commit a crime." ECF 129-1 at 31.

"arrested" Plaintiff only *after* receiving the eyewitness reports that had been given to Officer Waine.

Regardless of Officer Nagamatsu's subjective belief, as noted, Officer Nagamatsu placed Plaintiff in handcuffs almost immediately upon encountering him. At that time, neither Officer Nagamatsu nor Officer Waine had conducted any type of investigation into the veracity of the 911 witness's complaint, whether money was stolen, whether Plaintiff had an innocent explanation, or any other aspect of the alleged crime. Thus, any subjective belief by Officer Nagamatsu that probable cause existed would not objectively be reasonable. The Court finds as a matter of law that no probable cause existed to arrest Plaintiff at the time Officer Nagamatsu first stopped Plaintiff and placed him in handcuffs. *Accord State v. Morgan*, 106 Or. App. 138, 142 (1991) (concluding that when an informant only "possibly" knew whether a crime had been committed "such a report can give rise to a reasonable suspicion, [but] it does not reach the level of certainty required to establish probable cause").

## B.  Unconstitutional and Unlawful Seizure of Plaintiff's Person

Although Officer Nagamatsu did not have probable cause to arrest Plaintiff when Officer Nagamatsu placed Plaintiff in handcuffs, the Court has previously found that Officer Nagamatsu did have a reasonable suspicion that Plaintiff committed a crime and thus could "stop" Plaintiff for a brief "investigatory stop" or "*Terry* stop."[7] ECF 70 at 5. During a *Terry* stop, an officer "may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling [the officer's] suspicions." *United States v. Brown*, 996 F.3d 998, 1004 (9th Cir. 2021) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). One important issue in this case is

---

[7] *Terry* stops are brief investigative detentions as described in *Terry v. Ohio*, 392 U.S. 1, (1968).

whether placing Plaintiff in handcuffs transformed a lawful investigatory stop into an unlawful arrest without probable cause. (A second key issue, which will be discussed in the next section, is whether Officer Nagamatsu could put his hand into Plaintiff's pocket and retrieve the seven bills of cash found in that pocket before the Officer had probable cause to arrest Plaintiff.)

Under federal law, "[i]n distinguishing between a *Terry* stop and a full-blown arrest, we consider whether a reasonable person would believe that he or she is being subjected to more than a temporary detention, as well as the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Brown*, 996 F.3d at 1006. Use of handcuffs generally will transform an investigatory stop into an arrest unless "it is a reasonable response to legitimate safety concerns on the part of the investigating officers," *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996), or the suspect has "demonstrated an intention to evade arrest." *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005), *overruled in part on other grounds by Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). When considering the safety concerns of the officers, a court looks to "the severity of the crime at issue" and "whether the suspect poses an immediate threat to the safety of the officers or others." *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

Oregon law is similar. Use of handcuffs transforms an investigatory stop into an arrest unless the officer "develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or. 519, 524 (1987). The Oregon Court of Appeals has explained that immediately handcuffing a suspect is a violation of Oregon law:

> There may be circumstances in which the interests of officer safety could justify handcuffing a dangerous person who refuses to

> submit to a frisk during a lawful stop. But when an officer fails to
> follow the procedure outlined in ORS 131.625, and there is no
> reason to believe that attempting to do so would be futile, then the
> use of handcuffs exceeds the restraint permitted by the statute.
> Rhodes' decision to skip the frisk procedure and to immediately
> handcuff Eugene instead, constituted an unreasonable seizure.
> Handcuffing Eugene constituted an arrest that was not supported
> by probable cause. *State v. Morgan*, *supra*, 106 Or. App. at 141.
> That violated ORS 133.005(1), Article I, section 9, and the Fourth
> Amendment.

*State v. Johnson*, 120 Or. App. 151, 158 (1993).

Officer Nagamatsu placed Plaintiff in handcuffs almost immediately upon encountering him. As previously discussed, Officer Nagamatsu's witness statement discloses that he will tell the jury that he placed Plaintiff in handcuffs because Plaintiff matched the description given by the 911 caller and because Plaintiff stated that he did not know anything about the alleged theft. ECF 128 at 2 ("Officer Nagamatsu will testify that he placed Smith in handcuffs because he fit the description of the male who had just stolen money and Smith denied having any knowledge of money being taken."). This summary of anticipated testimony does not support the degree of intrusion of using handcuffs. The testimony does not provide any evidence that Officer Nagamatsu believed that Plaintiff might pose an immediate danger to Officer Nagamatsu or anyone else. The anticipated testimony also does not provide any evidence that Officer Nagamatsu believed Plaintiff to be armed and dangerous or that Plaintiff had demonstrated an intent to flee.

Additionally, the 911 caller accused Plaintiff of taking and then putting back a tip jar, and possibly taking and keeping money from that jar. This is, at most a nonviolent, misdemeanor offense. Plaintiff did not try to flee when Officer Nagamatsu approached, and he complied with Officer Nagamatsu's instructions for Plaintiff to drop his duffle bag and put his hands behind his back. *Cf. United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (concluding that officer's

handcuffing of a suspect during *Terry* stop was reasonable because the suspect twice refused to comply with an order to put his hands up and made "furtive" gestures with his hands inside of a truck where his hands could not be seen, thus creating reasonable suspicion that a frisk for a weapon and handcuffs were needed, particularly given the ratio of suspects to officers).

Under these facts, no reasonable juror could conclude that Officer Nagamatsu reasonably believed that Plaintiff posed an immediate threat to the safety of the officer or others or that Plaintiff demonstrated an intention to evade arrest. Thus, the Court finds, under both federal law and Oregon law, that Officer Nagamatsu unlawfully seized Plaintiff when he placed Plaintiff in handcuffs. The use of handcuffs unlawfully transformed a lawful investigatory stop into an unlawful arrest without a warrant or probable cause. This unlawful arrest continued for at least a few minutes until Officer Waine conducted the requisite independent investigation by interviewing eyewitnesses and confirming the basis of the 911 caller's knowledge about the alleged crime of misdemeanor theft or attempted theft and that Plaintiff was the right suspect. At that point, but only at that point, Officer Nagamatsu had probable cause to arrest Plaintiff.

## C.  Unconstitutional and Unlawful Search and Seizure of Property

Generally, a search of a person is unconstitutional unless it is pursuant to a warrant. There are several exceptions to this warrant requirement under federal law. As applicable here, under some circumstances an officer may perform a lawful pat down of a person during a lawful investigatory stop. There is a "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "To establish reasonable suspicion a suspect is armed and dangerous, thereby justifying a frisk, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Thomas v. Dillard*, 818 F.3d 864,

876 (9th Cir. 2016) (quoting *Terry*, 392 U.S. at 21). "A mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient." *Id.* (simplified) (emphasis in original). "There must be adequate reason to believe the suspect *is* armed." *Id.* (emphasis in original). Reasonable suspicion is an objective standard, considered under the totality of the circumstances, and the suspicion must be individualized. *Id.* at 876-77.

For the same reasons that the Court finds that no reasonable juror could find that Officer Nagamatsu had a reasonable suspicion supporting any basis to handcuff Plaintiff when the Officer did, the Court finds that no reasonable juror could find Officer Nagamatsu had any reasonable suspicion justifying Officer Nagamatsu's search of Plaintiff's pocket when the Officer did that. Based on Officer Nagamatsu's witness statement describing why he handcuffed and searched Plaintiff, Officer Nagamatsu did not have specific and articulable facts on which to base a belief or suspicion that Plaintiff posed an immediate threat or danger or that he was armed or dangerous. *See* ECF 128 at 2. Officer Nagamatsu's witness statement does not disclose any anticipated testimony that he suspected or believed that Plaintiff was armed, dangerous, or a threat. Instead, as noted above, Officer Nagamatsu intends to testify that he handcuffed and searched Plaintiff because Plaintiff matched the description of a possible misdemeanor thief and because Plaintiff denied committing the crime. Neither of these reasons justifies Officer Nagamatsu reaching into Smith's pocket.

According to Officer Nagamatsu's witness statement:

> Smith denied taking any money from the jar and Officer
> Nagamatsu will testify that he placed Smith in handcuffs because
> he fit the description of the male who had just stolen money and
> Smith denied having any knowledge of money being taken. He
> patted Smith down for weapons but found only a bulge in the right
> front pocket of the shorts Smith was wearing and could not tell

what it was. Upon removing the item he discovered it was not a
weapon but a ten-dollar bill and six one-dollar bills crumpled up in
Smith's pocket. He thought the bulge could have been a weapon or
concealing a weapon.

ECF 128 at 2.

As the Court previously held, *see* ECF 70 at 6-7, a protective pat down may be justified

but only to protect the safety of the officer and others nearby, not to uncover and preserve

evidence and "must therefore be confined in scope to an intrusion reasonably designed to

discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

*Terry*, 392 U.S. at 29. To frisk a suspect, an officer may "conduct a carefully limited search of

the outer clothing of such persons in an attempt to discover weapons which might be used to

assault him." *Id.* at 30; *see also Dickerson*, 508 U.S. at 373 ("The purpose of this limited search

is not to discover evidence of crime, but to allow the officer to pursue his investigation without

fear of violence." (citation and quotation marks omitted)). "If the protective search goes beyond

what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*[.]"

*Brown*, 996 F.3d at 1008 (quoting *Dickerson*, 508 U.S. at 373).

Officer Nagamatsu states in his Supplemental Declaration that he saw a bulge in

Plaintiff's pocket, *see* ECF 62 at 2, and this may support a protective pat down to determine

whether the bulge was a weapon. An officer may reach into a suspect's pocket during a

protective pat down, however, only if he feels an object and it is "immediately apparent" that the

object is a weapon or contraband. *Dickerson*, 508 U.S. at 375 (stating that "[i]f a police officer

lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes

its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that

already authorized by the officer's search for weapons"). "We think that this [plain-view]

doctrine has an obvious application by analogy to cases in which an officer discovers contraband

through the sense of touch during an otherwise lawful search." *Id*. Further, if an officer feels an object that is not clearly a weapon but could be one, he is permitted to manipulate the object to ascertain that it poses no threat but may go no further. *See United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000).

Here, however, Officer Nagamatsu went well beyond what is permitted, thus making his reaching into Smith's pocket an unconstitutional search. Officer Nagamatsu does not state that as a result of his pat down of Plaintiff's pants pocket the Officer felt an object whose contour or mass made it immediately apparent (or even likely) that the Officer was feeling a weapon. Nor did Officer Nagamatsu state that he manipulated the seven paper bills of currency to ascertain whether they might pose a threat. Further, no reasonable juror could find that seven bills of currency, even wadded up in a pocket, could feel like a weapon. Thus, because the search of Plaintiff's pocket was unlawful, the seizure of the money found in that pocket (one $10 bill and six $1 bills) also was unlawful. Accordingly, the Court finds as a matter of law that Officer Nagamatsu violated Plaintiff's Fourth Amendment rights when he reached into Smith's pocket and seized the seven bills of cash.

**D. Plaintiff's Fifth Amendment Claim**

Because the Court finds that no reasonable juror could find other than that Plaintiff was in custody when he was in handcuffs, the jury does not need to decide this element of Plaintiff's claim under the Fifth Amendment.

**E. Conclusions**

All that remains for trial are four claims under 42 U.S.C. § 1983 that Plaintiff asserts against Officer Nagamatsu and one claim under Oregon state law that Plaintiff asserts against the City. Under § 1983, Plaintiff alleges that Officer Nagamatsu, a police officer employed by the City, violated Plaintiff's constitutional rights by: (1) arresting Plaintiff by placing Plaintiff in

handcuffs, in violation of the Fourth Amendment; (2) searching Plaintiff by reaching into his pocket, in violation of the Fourth Amendment; (3) seizing Plaintiff's property by taking possession of Plaintiff's cash from Plaintiff's pocket, in violation of the Fourth Amendment; and (4) failing to inform Plaintiff of his *Miranda* rights before questioning him, in violation of the Fifth Amendment. Under state law, Plaintiff alleges that the City is liable for Officer Nagamatsu's actions when Officer Nagamatsu unlawfully arrested Plaintiff by placing him in handcuffs.[8]

As previously discussed, the Court finds that no reasonable juror could conclude that when Officer Nagamatsu placed Plaintiff in handcuffs, searched Plaintiff's pocket, and retrieved seven bills, Officer Nagamatsu had any reasonable suspicion that Plaintiff was armed and dangerous, that Plaintiff was an immediate threat to safety, or that Plaintiff had an intention to evade arrest. The Court also finds that no reasonable juror could conclude that when Officer Nagamatsu placed Plaintiff in handcuffs Officer Nagamatsu had probable cause to arrest Plaintiff. Thus, all that is left for the jury to decide regarding Plaintiff's claims of unlawful arrest, unlawful search, and unlawful seizure of property are damages (actual, nominal, and punitive)

---

[8] The Court previously granted summary judgment in favor of the City on Plaintiff's municipal liability claim under § 1983. ECF 70 at 7. The Court now finds that Plaintiff's Fifth Amendment claim similarly cannot be brought against the City. In addition, Plaintiff concedes that any state law claim may be brought only against the City. ECF 118 at 7. Further, as discussed below in connection with Defendants' second motion *in limine*, the Court is not allowing Plaintiff to assert a claim based on lost or missing video evidence. Finally, although Plaintiff proposes a jury instruction for "illegal search" under Oregon law and describes his state law claim as illegal search and seizure, Plaintiff's complaints have always alleged his state law claim as being only "false arrest and imprisonment," and the Court previously has discussed Plaintiff's relevant state law claim as being only false arrest and imprisonment. After the Court tentatively accepted Plaintiff's inclusion of illegal search as part of his state claim, Defendants explained how such an expansion at this late stage of the proceedings would unduly prejudice them. Accordingly, the Court limits Plaintiff's state law claim to the false arrest claim alleged in his complaint.

under Plaintiff's § 1983 claims against Officer Nagamatsu and the City's affirmative defense of untimely notice under the Oregon Tort Claims Act (OTCA) and damages under Plaintiff's state law false arrest claim against the City. In addition, Plaintiff's Fifth Amendment Claim remains for the jury on both liability and damages.

## MOTIONS *IN LIMINE*

### A. Plaintiff's Motions *in Limine*

#### 1. Plaintiff's Motion 1: Other Legal Disputes—GRANTED IN PART

Plaintiff states that this lawsuit is about a single arrest and prosecution. The arrest happened May 28, 2015, for misdemeanor theft. The trial in Municipal Court in The Dalles on that charge occurred in June 2017. The Wasco County Circuit Court dismissed that charge in February 2018. Plaintiff moves to exclude evidence and argument relating to any *other* legal dispute involving Plaintiff. The Court divides these "other legal disputes" into three categories:

##### a. Plaintiff's Other Civil Lawsuits and OTCA Claims

Plaintiff argues that any other civil lawsuits that he filed and any other claims that he asserted under the Oregon Tort Claims Act are irrelevant. The Court agrees. They are excluded under both FRE 402 and 403 unless Plaintiff "opens the door" to their admissibility.

##### b. Plaintiff's Other Arrests and Convictions

Plaintiff intends to call Ms. Jonicia June Shelton, MA, CSWA, and QMHP, as an expert witness. According to Plaintiff, Ms. Shelton "will offer her opinion that plaintiff experienced the events of May 28, 2015 as a trauma, which was exacerbated in the June 2017 trial, causing Mr. Smith mental distress throughout and since. She will opine on the nature of the harm, and on possible actions that could be taken to redress that harm, at least in part." ECF 145 at 3. Among other things, Ms. Shelton bases her opinion on "her initial interview with Mr. Smith." *Id*.

To the extent that Plaintiff chooses to present to the jury any of his other arrests, convictions, or encounters with other law enforcement personnel as part of his "life background" in support of his "eggshell plaintiff" theory, he may do so, but that will almost certainly "open the door" for Defendants to explore those situations, at least to a reasonable extent. If, however, Plaintiff does not open the door regarding a particular arrest, conviction, or other encounter, then, under Rule 403, Defendants may not inquire into those areas or incidents.

The Court also notes that Rule 703 of the Federal Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. *But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.*

Fed. R. Evid. 703 (emphasis added). In this case, to the extent that Plaintiff testifies about specific instances in his life experience to lay the foundation for Ms. Shelton's expert opinion, Plaintiff may do so, but he then risks opening the door for Defendants to discuss those instances. Further, to the extent that Plaintiff has *not* discussed in his testimony a specific instance that occurred in his background for purposes of showing him to be an "eggshell plaintiff," Ms. Shelton may not describe those instances to the jury if her sole information about them would be otherwise inadmissible hearsay from Plaintiff. In that event, the Court concludes that the probative value of such hearsay would not substantially outweigh its prejudicial effect.

### c. Plaintiff's Felony Convictions

The Court understands that Plaintiff has prior convictions for rape and sexual assault, among other offenses. Prior felony convictions (and some misdemeanor convictions) may be admissible under Rule 609 to impeach credibility. "A conviction for rape is not highly probative

of credibility." *Christmas v. Sanders*, 759 F.2d 1284, 1292 (7th Cir. 1985). "By contrast, the risk of unfair prejudice that would result from admission of this evidence is substantial." *Id*. The risk is that

> if the jury learns of plaintiff's prior record for aggravated criminal sexual assault, it will view him as a "bad person" not because he is a liar (since this sex offense is not highly probative of credibility), but rather because he would perpetrate a sex offense that jurors might find odious. Thus, a jury may deny plaintiff a verdict and an award, not because it doubts his veracity, but because it is appalled by his prior conduct that has nothing to do with the events in question. That is precisely the kind of unfair prejudice that Rule 403 seeks to prevent.

*Id*. Accordingly, if Plaintiff's prior convictions for rape or sexual assault are otherwise appropriate for impeachment under Rule 609, the impeaching party shall be limited, at least without express prior approval of the Court, to eliciting only that the witness previously has been convicted of felony offenses, and nothing more, regarding those two specific convictions.

Further, Plaintiff's rape conviction appears to involve an unconscious white female. *See* ECF 119 at 1. It does not appear that Plaintiff's expert, Ms. Shelton, was aware of this conviction. *See* ECF 110 at 9. Thus, this accusation and conviction, including its cross-racial aspects, could not have been part of Ms. Shelton's opinions or the bases for her opinions. If that is correct, then there shall be no mention by Defendants at trial of Plaintiff's prior convictions for rape or sexual assault, unless Plaintiff first opens the door, with testimony from Plaintiff, Ms. Shelton, or in some other manner.

## 2. Plaintiff's Motion 2: Documents Not Previously Produced in Discovery-- DENIED

Plaintiff moves to exclude any documents responsive to Plaintiff's Request No. 1, No. 2, or No. 7, not previously provided to Plaintiff. Rather than resolve this motion in the abstract, the Court denies this motion with leave for Plaintiff to object to any specific document that

Defendants seek to introduce in evidence. (Plaintiff objects to Defendants' Exhibits 209-213, which purport to relate to Plaintiff's prior criminal records from other incidents. The Court has already discussed this issue in connection with Plaintiff's first motion *in limine* and will discuss it further in connection with Plaintiff's objections to Defendants' exhibits.)

## B.  Defendants' Motions *in Limine*

### 1.  Defendants' Motion 1: Settlement Offers and Insurance Coverage—GRANTED

Defendants moves to exclude any evidence of settlement offers or insurance coverage. This motion is granted and shall apply to both sides.

### 2.  Defendants' Motion 2: Lack of Video Evidence—GRANTED

According to Defendants, Plaintiff, for the first time in his trial brief, alleges a Fourteenth Amendment due process claim based upon Defendants' failure to obtain and preserve a video recording that allegedly captured Plaintiff's activities outside Grinders' Coffee Shop. Plaintiff contends the evidence would have been exculpatory, despite eyewitness testimony at his criminal trial that Plaintiff picked up the tip jar and started to walk away. Defendants argue that there is no evidence the video would have been exculpatory, and there is no evidence that Defendants ever obtained possession of such a video, or even saw it, because the private owner of the recording never turned it over to the police. Defendants also argue that the Court has already ruled, as a matter of law, that there was probable cause to arrest Plaintiff for the Theft III charge *after* the eyewitness identifications had been made. Thus. whether Plaintiff was innocent or guilty of the Theft III charge is not relevant in this case.

In response, Plaintiff asserts that, under *Miller v. Vasquez*, 868 F.2d 1116, 1120-21 (9th Cir. 1989), "a bad faith failure to collect potentially exculpatory evidence would violate the due process clause." Plaintiff's only prior reference to this video evidence was as part of Plaintiff's state law negligence claim, which the Court has previously dismissed. Before Plaintiff's trial

brief, Plaintiff never said anything in any of his complaints about a potentially exculpatory video (or Defendants' failure to collect and maintain it) as being part of Plaintiff's claims under § 1983. Discovery has long closed, and Plaintiff fails to show good cause for allowing a new theory of liability under § 1983 to be asserted for the first time in a trial brief. Defendants' motion to exclude evidence relating to the "missing video" is granted.

### 3. Defendants' Motion 3: Money Seized from Plaintiff—DENIED

At the time of Plaintiff's arrest, he was found to be in possession of a $10 bill and several $1 bills, which the employees at the coffee shop believed had been taken from their tip jar. Plaintiff was released within twenty-four hours after his arrest. He then returned to the Police Department to retrieve his backpack and the seized money. The police, however, told Plaintiff that the seized bills were being kept for evidentiary purposes. Plaintiff never made any further effort to get back that currency.

Oregon law has a specific procedure that allows a party to seek the return of any property seized after a criminal case has been resolved, and Plaintiff never took advantage of that procedure, which is found in Oregon Revised Statutes (ORS) § 133.633. Defendants argue that this is the proper method to obtain the return of seized property. Under this procedure, Plaintiff needed to file a motion (for which no fee is charged) and show to the satisfaction of a state court that the money belonged to him "beyond a reasonable doubt." *See id.*

Plaintiff responds that ORS § 133.623 does not limit the damages available to him under 42 U.S.C. § 1983. *See, e.g.*, *Felder v. Casey*, 487 U.S. 131, 143-44 (1988) (holding state notice-of-claim statute "patently incompatible with the compensatory goals of the federal legislation, as are the means the State has chosen to effectuate it"); *cf. Reuter v. Skipper*, 4 F.3d 716 (9th Cir. 1993) (affirming ruling declining to limit § 1983 relief under a federal labor law anti-injunction provisions, citing *Felder* and the central purpose of § 1983 "to provide compensatory

relief to those deprived of their federal rights by governmental bodies"). Accordingly, if Plaintiff proves that he suffered damage, including the loss of his property, due to unconstitutional conduct under color of state law, he may be made whole.

### 4. Defendants' Motion 4: Punitive Damages—GRANTED IN PART

Defendants move to preclude Plaintiff from seeking punitive damages. The resolution of this motion depends on the specific defendant. Based on prior rulings in this case, Plaintiff may not assert any claims under § 1983 against the City. Moreover, even if he could, municipalities are not liable for punitive damages. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985); *Smith v. Wade*, 461 U.S. 30, 36 n.5 (1983); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Further, regarding Plaintiff's state claim against the City, that claim is subject to the OTCA, ORS §§ 30.260 to 30.300. "Punitive damages may not be awarded on any claim subject to ORS 30.260 to 30.300." ORS § 30.269(1). Thus, Plaintiff may not seek punitive damages against the City.

Regarding Plaintiff's claims under § 1983 against Officer Nagamatsu, punitive damages may be available.[9] *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17 (1991); *Graham*, 473 U.S. at 167 n.13; *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). Punitive damages may even be available when a plaintiff is unable to show compensable injury. *See Smith*, 461 U.S. at 55

---

[9] Defendants also argue that Plaintiff should be precluded from seeking punitive damages because Plaintiff did not previously request those damages. Plaintiff requested punitive damages in his original complaint (ECF 1) and amended complaint (ECF 7). He appears to have dropped his request for punitive damages in his third *pro se* amended complaint, filed in May 2019. But Defendants knew for 32 months that Plaintiff was seeking punitive damages. Further, in federal court, a plaintiff may be entitled to damages even though a complaint did not expressly request them. *See Z Channel, Ltd. v. Home Box Office*, 931 F.2d 1338, 1341 (9th Cir. 1991). An exception to this rule applies when the failure to demand certain relief unfairly prejudices the opposing party. *See International Harvester Credit Corp. v. East Coast Truck*, 547 F.2d 888, 891 (5th Cir. 1977). Here, however, Defendants do not argue that there would be any unfair prejudice from allowing Plaintiff to reassert his request for punitive damages against Officer Nagamatsu.

n.21. Further, punitive damages are awarded in the jury's discretion. *See Smith*, 461 U.S. at 54;

*Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1206 (9th Cir. 1991).

The jury, however, must find either that a defendant acted with an evil motive or

demonstrated reckless indifference to the constitutional rights of the plaintiff before imposing

punitive damages against that defendant. *See Smith*, 461 U.S. at 56; *accord Dang*, 422 F.3d

at 807-09 (holding "that oppressive conduct is a proper predicate for punitive damages under

§ 1983"). The jury must also "make 'a discretionary moral judgment' that the 'conduct merit[s] a

punitive award.'" *Woods*, 925 F.2d at 1206 (quoting *Smith*, 461 U.S. at 52). Whether there are

sufficient facts that will be presented at trial to allow the jury to award punitive damages against

Officer Nagamatsu under § 1983 is a question that the Court will decide after the close of the

evidence.

## OBJECTIONS TO EVIDENCE

### A. Defendants' Objections to Plaintiff's Trial Exhibits

Plaintiff offers Exhibits 1-10 and 18, to which Defendants have no objections. These

eleven exhibits are preadmitted and received in evidence. Plaintiff has withdrawn Exhibit 21.

ECF 148 at 2. Defendants object to Plaintiffs' Exhibits 11-17, 19-20, and 22-26. The Court rules

as follows on Defendants' objections:

Ex. 11        Overruled. The Court is of the understanding that the parties do not

dispute that "Ronnie Medinger" refers to Plaintiff Ronnie Smith. If that understanding is correct,

Defendants' objection to Ex. 11 is overruled under FRE 803(4).

Ex. 12        Overruled. FRE 803(4).

Ex. 13        Overruled. FRE 803(4).

Ex. 14        Overruled. FRE 803(4).

Ex. 15        Overruled. FRE 803(8)

Ex. 16          Overruled. FRE 801(d)(2).

Ex. 17          Sustained. FRE 802, 402, and 403.

Ex. 19          Overruled. FRE 803(8).

Ex. 20          Overruled. FRE 803(8).

Ex. 22          Overruled. FRE 803(8).

Ex. 23          Ruling reserved until trial.

Ex. 24          Overruled. FRE 801(d)(2).

Ex. 25          Conditionally sustained in part and overruled in part. If an appropriate foundation is shown under FRE 803(18), a relevant statement from this exhibit may be read into evidence, but the document itself will not be received as an exhibit.

Ex. 26          Conditionally sustained in part and overruled in part. If an appropriate foundation is shown under FRE 803(18), a relevant statement from this exhibit may be read into evidence, but the document itself will not be received as an exhibit.

Summary: The following Plaintiff Exhibits are preadmitted and received in evidence: 1-16, 18-20, 22, and 24.

## B. Plaintiff's Objections to Defendants' Trial Exhibits

The Court rules as follows on Defendant's Trial Exhibits:

Ex. 201          Ruling reserved. If Ex. 201 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 202.          Ruling reserved. If Ex. 202 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 203          Ruling reserved. If Ex. 203 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 204.        Ruling reserved. If Ex. 204 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 205        Ruling reserved. If Ex. 205 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 206.        Ruling reserved. If Ex. 206 is the same as one of Plaintiff's exhibits, the parties should use Plaintiff's exhibit.

Ex. 207.        Sustained. Ex. 207 appears to be Plaintiff's Complaint (ECF 1). In federal court, pleadings are not generally received in evidence. If Defendants seek to impeach Plaintiff with a statement from Plaintiff's Complaint, Defendants may do so orally, if the statement is not otherwise excluded by the Court.

Ex. 208.        Sustained. Ex. 208 appears to be Plaintiff's Third Amended Complaint (ECF 109). In federal court, pleadings are not generally received in evidence. If Defendants seek to impeach Plaintiff with a statement from Plaintiff's Third Amended Complaint, Defendants may do so orally, if the statement is not otherwise excluded by the Court.

Exs. 208-213.        Rulings reserved. These exhibits appear to relate to Plaintiff's prior convictions. Accordingly, they are subject to the Court's ruling on Plaintiff's Motion *in Limine* No. 1(B). If Plaintiff (or Plaintiff's expert witness) opens the door, these convictions may become the subject of proper cross-examination. In addition, if Plaintiff testifies, and if these convictions are otherwise appropriate under FRE 609 for impeachment purposes, they may be used, subject to the Court's ruling prohibiting any mention of a conviction for rape or sexual abuse.

**C. Deposition Designations, Cross-Designations, and Objections**

**1. Plaintiff's Designations and Defendants' Cross-Designations**

Plaintiff designated excerpts from the June 6, 2017 trial testimony of five witnesses, and Defendants cross-designated other excerpts from the trial testimony of those witnesses, which the parties have agreed to treat as "deposition testimony" to be used in lieu of live testimony. The following testimony (from ECF 129-1) will be allowed, which the parties have highlighted in yellow (Plaintiff) and blue (Defendants):

a. Ron Patterson:  pp. 32-35 and pp. 72-74

b. Sheryl Maki:  pp. 37-42

c. Joe Davit:  pp. 43-46

d. Officer Waine:  pp. 47-50

e. Jared Sawyer:  pp. 58-63

**2. Defendants' Designations and Plaintiff's Cross-Designations of Ms. McBride**

Defendants also designated excerpts from the June 6, 2017 trial testimony of Mikalya McBride, which the parties similarly have agreed to treat as "deposition testimony" to be used in lieu of live testimony. The following testimony (from ECF 129-1) will be allowed, which the Defendants have highlighted in blue:

f. Mikalya McBride:  pp. 51-54

**3. Defendants' Designations of Plaintiff's trial testimony**

Defendants also designate excerpts from the June 6, 2017 trial testimony of Plaintiff, at pages 61-63 and 68-69 (highlighted in blue), to which Plaintiff objects on the ground that he will be present to testify at trial. With two exceptions noted below, the Court overrules Plaintiff's objection and will allow Defendants to read to the jury the highlighted portions of Plaintiff's prior testimony during the cross-examination of Plaintiff, so that Plaintiff may have a fair

opportunity to explain, if he wishes. Defendants will not, however, be allowed to read to the jury the following questions and answer from page 69:

> Q.     Recalling back to the date in question: Which was May 28th, 2015, you had been drinking um, and you thought you were grabbing a coffee cup?

> A.     I never said that today.

> *        *        *

> Q.     Um, and so you thought the tip jar filled with cash was a cup of coffee?

> A.     I never said that.

Defendants may not read to the jury these two questions and answers from Plaintiff's testimony on June 6, 2017.

## DEFENDANTS' MOTIONS FOR RECONSIDERATION

In Defendants' trial brief, Defendants assert several arguments that the Court construes as motions for reconsideration of previous rulings. Earlier in this Opinion and Order, the Court addressed Defendants' arguments regarding probable cause. The Court now addresses Defendants' arguments about qualified immunity under § 1983 and the OTCA's statute of limitations.

### A.  Qualified Immunity

Defendants argue that Officer Nagamatsu is entitled to qualified immunity because Supreme Court cases allow police to arrest persons based on information from informants that is sufficiently reliable, specific, and detailed. As discussed above, however, Officer Nagamatsu did not receive sufficiently detailed and reliable information simply from the information relayed through the 911 call. Defendants also argue that Officer Nagamatsu is entitled to qualified

immunity because there is no Ninth Circuit case with the same underlying facts—a misdemeanor crime and a contemporaneous 911 call with a detailed description.

Defendants' argument is rejected because clearly established law for qualified immunity does not require the same facts. "To determine whether Officer [Nagamatsu] violated clearly established law, we look to cases relevant to the situation Officer [Nagamatsu] confronted, mindful that there need not be a case directly on point." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that officials can "still be on notice that their conduct violates established law even in novel factual circumstances"); *Whalen v. McMullen*, 907 F.3d 1139, 1153 (9th Cir. 2018) ("Whalen does not have to identify a controlling case finding a constitutional violation on the exact facts of her case for her asserted right to be clearly established[.]").[10]

For example, in *Bonivert v. City of Clarkson*, the defendant officers entered the plaintiff's home without a warrant, and the Ninth Circuit rejected the defendants' argument that qualified immunity applied because no precedent had resolved the precise facts underlying the plaintiff's claim. 883 F.3d 865, 873 (9th Cir. 2018). The Ninth Circuit observed, "This is not a case involving 'such an undeveloped state of the law' that qualified immunity is necessary to protect the officers from the special unfairness that results when they are 'expected to predict the future course of constitutional law.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 617-18 (1999)).

---

[10] The Court notes that because resolving whether the asserted federal right was clearly established presents a pure question of law, the Court is not aware of any reason it should not draw on its "full knowledge" of relevant precedent in laying a strong foundation at the trial court level, rather than restricting its review to cases identified by Plaintiff. *See Elder v. Holloway*, 510 U.S. 510, 514-16 (1994) (holding that the appellate court must review qualified immunity judgment *de novo* and resolve whether the federal right was clearly established in light of "its full knowledge of its own [and other relevant] precedents" (alteration in original) (citing *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984) ("We see no reason to doubt . . . that the Court of Appeals . . . had full knowledge of its own precedents and correctly construed them."))).

Rather, the officers were not entitled to qualified immunity given that the unlawful entry claim turned on "bedrock Fourth Amendment principles" and "basic, unquestioned rights," which rendered the officers' "mistake[ ] 'as to what the law require[d]' to justify a warrantless entry . . . not 'reasonable.' " *Id.* at 872-74 (citations omitted).

Similarly, the arrest of a person without probable cause involves bedrock Fourth Amendment principles. At the time Officer Nagamatsu placed Plaintiff in handcuffs, Ninth Circuit case law was clearly established that an officer does not have probable cause to arrest a person based solely on an eyewitness report, without conducting an independent investigation. *See Struckman*, 603 F.3d at 741-42; *Hopkins*, 573 F.3d at 767; *John*, 515 F.3d at 940-41; *Arpin*, 261 F.3d at 925; *Fuller*, 950 F.2d at 1444. This area of the law was well developed, with cases involving 911 calls and cases involving detailed witness descriptions. Further, Officer Nagamatsu did not receive his information directly from a witness and thus could not evaluate the veracity or reliability of the information. The Court declines to reconsider its earlier ruling on qualified immunity.

## B. OTCA Limitations Period/Timely Notice Requirement

Defendants argue that the Court should find as a matter of law that Plaintiff's state law claim is barred by the OTCA's 180-day limitations period because Plaintiff filed his original complaint in this case in 2016. Defendants assert that the discovery rule could not have been first triggered in 2018 when Plaintiff's state law prosecution was dismissed because Plaintiff filed this lawsuit in 2016 and the complaint shows that Plaintiff knew or should have known about his state law claim. The discovery rule under Oregon law is triggered when Plaintiff *knew his arrest was unlawful under state law*. The Oregon Court of Appeals has explained that this means when a person knew or reasonably should have known facts that would alert the person to a substantial

possibility that no probable cause existed. *Denucci v. Henningsen*, 248 Or. App. 59, 69-70 (2012). This determination is ordinarily a question for the jury. *Id.* at 67.

The issue of probable cause has been difficult for the parties and the Court to address in this case. Plaintiff did not assert his state law claims in this case until 2019, after his underlying criminal case was dismissed in state court. Before then, Plaintiff only filed his federal claims. The Court does not find that the fact that Plaintiff filed federal claims under the Fourth Amendment in 2016 shows as a matter of law that he knew enough facts to alert him to a substantial possibility that his arrest under Oregon law was without probable cause. He had the subjective belief that his arrest was unlawful, but that is not determinative. *Id.* at 69 n.9 (noting that courts do "not impute to an arrestee knowledge that she [or he] was arrested without probable cause merely because she [or he] suffered the indignity of an arrest"). The Court declines to reconsider its denial of summary judgment on Defendants' affirmative defense based on the OTCA's statute of limitations and leaves for the jury to apply the OTCA's discovery rule.

## CONCLUSION

The parties' motions *in limine*, objections to evidence, Defendants' motions for reconsideration, and certain matters *sua sponte* addressed by the Court herein are all resolved as stated in this Opinion and Order on Pretrial Matters.

**IT IS SO ORDERED**.

DATED this 4th day of June, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge